UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO. **2:10-cv-577-FTM-29DNF**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| BIH CORPORATION, ) | |
| WAYNE A. BURMASTER, JR., ) | |
| EDWARD W. HAYTER, ) | (JURY TRIAL |
| NORTH BAY SOUTH CORPORATION, ) | DEMANDED) |
| BIMINI REEF REAL ESTATE, INC., ) | |
| RIVERVIEW CAPITAL INC., ) | |
| CHRISTOPHER L. ASTROM, and ) | |
| DAMIAN B. GUTHRIE, ) | |
| Defendants, ) | |
| ) | |
| BARON INTERNATIONAL, INC., ) | |
| THE CADDO CORPORATION, and ) | |
| BEAVER CREEK FINANCIAL CORPORATION, ) | |
| ) | |
| Relief Defendants. ) | |

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission alleges:

I.   INTRODUCTION

1.    From 2008 through at least March 2009, Defendants Wayne A. Burmaster, Jr.
and Edward W. Hayter implemented a pump-and-dump scheme involving the sale of
unregistered shares of Defendant BIH Corporation's stock to the investing public. Burmaster
and Hayter pumped up the price of BIH's stock by disseminating false and misleading press
releases and placing false information on BIH's website regarding, among other things, the
identity of the individuals directing BIH's affairs, BIH's operations and business

relationships, and BIH's stock and dividend payments. For example, in order for Burmaster and Hayter to mask their control over BIH, they created an alter ego, Cris Galo, who was purportedly BIH's president and chief executive officer and was allegedly an accomplished entrepreneur with interests in numerous businesses with investments in Florida, Washington, New Jersey and New York. In reality, Galo did not work for BIH as its president and CEO, and there was no accomplished entrepreneur running BIH with interests in numerous businesses in multiple states. Instead, there was only Burmaster and Hayter, who had both failed in their previous business ventures.

2.     Furthermore, as part of the scheme Burmaster and Hayter illegally distributed BIH's stock to Defendants North Bay South Corporation, controlled by Burmaster; Bimini Reef Real Estate, Inc., controlled by Defendant Christopher L. Astrom; and Riverview Capital Inc., controlled by Defendant Damian B. Guthrie. The Defendants then dumped more than $1 million of BIH's stock on unwitting investors and divided these illegally obtained sales proceeds among themselves and Relief Defendants Baron International, Inc., Beaver Creek Financial Corporation, and The Caddo Corporation.

3.     Through their conduct, the Defendants each have violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) and 77e(c); BIH, Burmaster, and Hayter also violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5. Unless restrained and enjoined, the Defendants are reasonably likely to engage in future violations of the federal securities laws.

## II.    DEFENDANTS, RELIEF DEFENDANTS AND RELATED INDIVIDUAL

### A.    Defendants

4.      **BIH** is a Nevada corporation that was headquartered in Fort Myers, Florida. During the relevant time period, BIH was a penny stock and claimed to be a holding company specializing in the restaurant and hospitality industry.  BIH was previously known as Prime Restaurants, Inc.  In February 2009, the Commission entered an order temporarily suspending trading in BIH's stock.  Prior to the suspension, BIH's stock traded on the Pink Sheets.

5.      **Burmaster**, 40, resides in Staten Island, New York.  He along with Hayter controlled BIH during the relevant time period.  Prior to being involved with BIH, Burmaster was affiliated with two failed business ventures in the restaurant and hospitality industry, Prime Restaurants and IBAC Corp.  When the Commission initially took Burmaster's testimony during its investigation, he asserted his Fifth Amendment privilege against self-incrimination to numerous questions.  Burmaster also served as a director of North Bay.

6.      **Hayter**, 53, resides in New York.  He along with Burmaster controlled BIH during the relevant time period.  After the Commission issued a trading suspension in BIH's stock, Hayter formally stepped into the role of BIH's president and chief executive officer. Prior to being involved with BIH, Hayter was affiliated with Prime Restaurants and IBAC. When the Commission took Hayter's testimony during its investigation, he also asserted his Fifth Amendment privilege to numerous questions.

7.      **North Bay** is a Texas corporation headquartered in Houston, Texas. Burmaster operates North Bay, which purportedly is in the investment banking business. North Bay acted as a statutory underwriter by selling unregistered shares of BIH and as a

3

conduit to allow Hayter and Burmaster to distribute BIH shares to the public. North Bay generated more than $110,000 from selling shares of BIH.

8.     **Bimini Reef** is a Texas corporation that previously maintained an office in Minnesota. It purportedly is in the real estate business. Bimini Reef acted as a statutory underwriter by selling unregistered shares of BIH and as a conduit to allow Hayter and Burmaster to distribute BIH shares to the public. Bimini Reef generated more than $500,000 from selling shares of BIH.

9.     **Astrom**, 38, resides in Gulfport, Florida. He is president of Bimini Reef. Astrom acted as a statutory underwriter by selling unregistered shares of BIH and a conduit to allow Hayter and Burmaster to distribute BIH shares to the public.

10.     **Riverview** is a Minnesota corporation headquartered in Bloomington, Minnesota. Riverview acted as a statutory underwriter by selling unregistered shares of BIH and as a conduit to allow Hayter and Burmaster to distribute BIH shares to the public. Riverview generated more than $500,000 from selling shares of BIH.

11.     **Guthrie**, 35, resides in Ocala, Florida. He is Riverview's chief executive officer. Guthrie acted as a statutory underwriter by selling unregistered shares of BIH and a conduit to allow Hayter and Burmaster to distribute BIH shares to the public.

**B.     Relief Defendants**

12.     **Baron** is a New Jersey corporation headquartered in West Orange, New Jersey. It purportedly builds restaurants and sells beverage systems and equipment. In 2008, Baron purportedly became a subsidiary of BIH. Without any legitimate basis, Baron received more than $90,000 in proceeds emanating from the Defendants' securities fraud.

13.     **Beaver Creek** is a Minnesota corporation headquartered in Edina, Minnesota. Hayter runs Beaver Creek, which purportedly provides consulting services.  Without any legitimate basis, Beaver Creek received more than $230,000 in proceeds emanating from the Defendants' securities fraud.

14.     **Caddo** is a Texas corporation headquartered in Houston, Texas.  Hayter runs Caddo, which purportedly is in the investment banking business.  Without any legitimate basis, Caddo received more than $240,000 in proceeds emanating from the Defendants' securities fraud.

**C.     Related Individual**

15.     **Christian Gallo**, 35, is a resident of Staten Island, New York.  He is Burmaster's brother-in-law.  To compel Gallo to testify and produce documents, in 2010 the Commission filed a subpoena enforcement action against him, *SEC v. Christian Gallo*, 1:10-mc-20444-ASG-Gold (S.D. Fla.).   When Gallo finally provided investigative testimony, he asserted his Fifth Amendment privilege to numerous questions.  In response to the questions where he did not submit his Fifth Amendment privilege, Gallo testified, among other things, that his work experience primarily consisted of working off-the-book jobs, such as collecting cans out of the recycling garbage bail in his neighborhood, and working as a public adjustor. He also said he sometimes used the alias, Cris Galo.  Notably, Gallo did not testify that he had ever worked for BIH or Prime Restaurants.

**III.   JURISDICTION AND VENUE**

16.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

17.     The Court has personal jurisdiction over the Defendants, and venue is proper in the Middle District of Florida because many of the Defendants' acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the Middle District of Florida.  In addition, BIH's principal place of business during the relevant time period was in the Middle District of Florida, and Astrom and Guthrie reside in the Middle District of Florida.

18.     In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

## IV.     THE DEFENDANTS' FRAUDULENT SCHEME

### A.     BIH's Fictitious President and CEO -- Galo

19.     During the relevant time period, BIH claimed on its website that Galo was purportedly a 42 year old "accomplished entrepreneur" with interests in numerous businesses, who allegedly served as BIH's president and CEO.  The website claimed that he had a benevolent business philosophy, since he only did "mutually beneficial agreements that result in a positive outcomes [sic] for everyone" and under "no circumstances will" he enter any agreement that will not benefit BIH's shareholders.  Galo also reportedly maintained business investments in various states, including Florida.  Galo, however, was an alter ego Hayter and Burmaster used to mask their domination and control over BIH, and to carry out a classic penny stock pump-and-dump.

20.     Hayter and Burmaster controlled and dominated virtually every facet of BIH. BIH's corporate address was in Fort Myers, Florida.  However, this address was nothing more

than a UPS mailbox Burmaster rented, who had incoming mail forwarded to a commercial mailbox in New York that Hayter rented.  Further evidencing their control over BIH, phone calls to the company's corporate phone number were routed to Burmaster via a commercial answering service.

21.     Furthermore, while Galo was listed as the contact person for BIH's registered agent service, Galo's contact information was actually Burmaster's personal email address and a fax number both Burmaster and Hayter used.  Also, Galo supposedly signed off on correspondence with BIH's transfer agent and NASDAQ, yet Burmaster's and Hayter's phone numbers and emails addresses were used in such communications.  Finally, while Galo was listed as the contact person for BIH's Marketwire account, through which BIH disseminated its fraudulent press releases, the addresses, email addresses, and phone numbers given for Galo linked to Burmaster and Hayter.

22.     Moreover, the two had previously used Galo to mask who actually controlled BIH's predecessor, Prime Restaurants when investors were concerned Hayter was running another stock scam.  For example, in an August 2, 2007, Prime Restaurants' press release addressing shareholders' questions and concerns, claimed the fictitious Galo was the president, CEO and majority shareholder of Prime Restaurants, and that Hayter "neither owns or controls any stock in the company and has no positions in the management of the company."

**B.     Fraudulent Press Releases**

23.     BIH, Burmaster, and Hayter made numerous material misrepresentations and omissions in addition to the false statements on BIH's website concerning Galo.

24.     On March 18, 2008, BIH, Burmaster, and Hayter, issued a press release that

Prime Restaurants was changing its name to BIH and quoted Galo. The quote of Galo was fabricated as the Galo represented on BIH's website does not exist.

25.      On April 22, 2008, BIH, Burmaster and Hayter issued a press release claiming that BIH had acquired Baron, a privately held entity with purported lucrative contracts in the restaurant services industry. In the press release, they claimed "that after tedious negotiations it has just agreed to expend several million dollars to complete its acquisition of Baron." However in reality, BIH did not expend anywhere near several million dollars to acquire Baron. The release also quoted BIH's non-existent president and CEO, Galo as purportedly stating that, we "are pleased that Baron International is now a 100% wholly owned subsidiary of BIH Corporation." The quote of Galo was fabricated as he did not exist.

26.      In an April 29, 2008 press release, BIH, Burmaster and Hayter announced Baron was awarded a contract for the "complete installation of beverage systems for all fifty (50) concession locations" at Citi Field in New York City, and that "revenues from this job are very substantial." On June 2 and June 19, 2008, they once again touted Citi Field as a client. BIH's statements were false and misleading, however, as Baron had only subcontracted to install just the beer dispensing equipment at Citi Field. Further, the contract was cancelled prior to the June 19 press release when Baron failed to meet contractual requirements.

27.      On April 30, 2008, BIH, Burmaster and Hayter announced the number of shares BIH had: authorized, outstanding, and restricted, as well as its public float. Once again, the press release purportedly quoted Galo. Once again, this quote was fabricated, since Galo did not exist. The press release was further misleading since Burmaster and Hayter were flooding the market with unregistered BIH shares.

8

28.     On June 2, 2008, BIH, Burmaster and Hayter announced BIH was going to implement a significant buyback/reduction of BIH's shares and once again purportedly quoted Galo. Once again, this quote was fabricated, since Galo did not exist. This press release was also misleading since Burmaster and Hayter were flooding the market with unregistered BIH shares.

29.     The following day, BIH, Burmaster and Hayter issued another press release that BIH was allegedly negotiating to acquire a restaurant equipment manufacturing firm that would allow BIH to "increase its revenues and profits." This press release once again purportedly quoted Galo. Once again, the quotes were fabricated, since Galo did not exist.

30.     On June 19, 2008, BIH, Burmaster and Hayter announced BIH was continuing the buyback program of BIH's shares and once again purportedly quoted Galo. Once again, this quote was fabricated, since Galo did not exist. This press release was also false and misleading because Burmaster and Hayter were flooding the market with unregistered BIH shares.

31.     On June 20, 2008, BIH, Burmaster and Hayter announced BIH had purportedly received an unsolicited offer to pay up to 20 cents a share for its stock and its board of directors would meet over the weekend to consider the offer. In addition, Galo was quoted as stating that BIH was "materially undervalued" and that he would "converse with the Board of Directors this weekend" to determine "what is the best for the shareholders of the company." On June 23, 2008, BIH, Burmaster and Hayter announced that BIH's board of directors, including Galo, had purportedly held a strategic meeting over the weekend regarding this offer for BIH's stock and that "all decisions" will consider the best interest of the company's shareholders. These press releases were false and misleading. Galo did not exist; therefore,

9

these meetings could not have taken place with Galo attending them, Galo was not making any decision for the company, and the quotes are fabricated.

32. On June 25, 2008, BIH, Burmaster and Hayter issued a press release and on the next day they also issued another press release. These press releases announced that BIH was going to sell Baron for between 19 and 23 cents a share and that if the sale is completed BIH would pay a one time cash dividend of between 7 and 9 cents a share. In addition, a purported company spokesman, Frank Nordstrom, claimed "Galo apologizes for the lack of direct contact with the company's shareholders as the negotiations" have "taken up every minute of his time." These press releases were false and misleading, because Galo did not exist so it is an utter falsehood to claim he was negotiating or working on this purported transaction.

33. Furthermore, on August 19, 2008, BIH, Burmaster and Hayter issued another press release regarding the purported pending sale of Baron. The press release claimed that additional revenues Baron generated would create "a higher then previously announced sales price." These statements were false and misleading because the additional revenues did not exist in sufficient amounts to generate a higher sales price.

34. On November 11, 2008, BIH, Burmaster and Hayter issued a press release responding to shareholders' inquiries that extensively quoted the fictitious Galo and claimed the potential purchase price of Baron had been increased due to "several lucrative new major accounts and increased revenue." These statements were false and misleading because the lucrative new major accounts or additional revenues to generate a higher sales price did not exist. Similarly, Galo did not exist.

35. On November 13, 2008, BIH, Burmaster and Hayter issued a press release that falsely reported Baron had "signed a multi-million dollar renovation deal to supply and

provide labor and materials for 20 Applebee's outlets" and quoted the fictitious Galo. These statements were false and misleading because Galo did not exist. This press release was also false and misleading, since Baron was servicing only one Applebee's franchisee, which resulted in Baron generating only approximately $4,000 in revenue.

36.    Between December 7, 2008 and January 12, 2009, BIH, Burmaster and Hayter issued several press releases that falsely announced plans to pay a cash and stock dividend. On December 7, they issued a press release stating "BIH will still pay its shareholders a dividend" and extensively quoting the fictitious Galo. On December 10, they issued another press release extensively quoting Galo stating, among other things, that Galo would use all his powers as majority shareholder to make sure the dividend payment included both a stock and a cash dividend. These statements were false and misleading as Galo could not use his purported powers to do anything as he did not exist, the quotes were fabricated, and BIH did not have the funds to pay the dividend.

37.    Moreover, on December 18, 2008, BIH, Burmaster and Hayter issued a press release stating BIH would pay a $0.005 cash dividend by December 31, 2008 from "earnings" and extensively quoting Galo on how he had purportedly won a hard fought battle with the board to pay a dividend. In addition, on January 7, 2009, BIH, Burmaster and Hayter issued another press release purportedly giving dates when BIH would make the dividend payment, and January 12, they issued another press release claiming BIH provided the FINRA/NASDAQ dividend department with the requisite notice to issue a cash dividend. These statements were false and misleading because Galo did not exist, BIH did not have the approximately $950,000 to pay the dividend, much less $950,000 in "earnings." Furthermore, BIH did not provide the FINRA/NASDAQ dividend department with the requisite notice to

issue a cash dividend. Notably, on January 29, 2009, BIH affected a 2-for-1 stock split, but failed to pay a cash dividend.

38.     Even though BIH traded on the pink sheets an inefficient market, overall, the fraudulent promotional activities of Burmaster and Hayter caused BIH's stock price and trading volume to increase markedly. For example, from April 22 through November 13, 2008, BIH's stock price fluctuated from a low of $0.001 to a high of $0.05 (a 4,900% increase), on average daily trading volume of 4.8 million shares. Prior to this, BIH's average daily trading volume was approximately 1.36 million shares at an average per share price of $0.0017. Furthermore, when BIH's stock price or trading volume decreased, Burmaster and Hayter would invariably try to prop up BIH's stock price and trading volume by issuing the above mentioned false and misleading press releases.

## C.     The Unregistered Offerings

39.     From 2008 through March 2009, the Defendants sold unregistered shares of BIH stock.   To capitalize on their pumping of BIH's stock, Burmaster and Hayter made unregistered offerings of BIH shares to North Bay, Bimini Reef and Riverview. BIH received little or no consideration for issuing tens of million of shares to these three companies. In turn these entities dumped more than $1 million of BIH's stock on investors at inflated prices. North Bay, Bimini Reef and Riverview, and their principles retained a portion of the more than $1 million of sales proceeds and sent the remaining funds to entities under the control of BIH, Burmaster and Hayter.

40.     Prior to BIH's promotional activities starting in April 2008, forgeries were executed on behalf of the fictional Galo as he purportedly issued nearly 40% of BIH's publicly available shares to Bimini Reef and Riverview for little or no consideration.

Moreover, various forgeries on behalf of the fictional Galo were placed on various corporate documents and given to BIH's transfer agent for stock issuances.

41.     Furthermore, from 2008 through 2009, Burmaster and Hayter issued an additional 36.4 million additional BIH shares to Riverview and North Bay, again for little or no consideration.

42.     Moreover, Hayter recruited Astrom and Guthrie to dump BIH shares through their respective nominee entities, Bimini Reef and Riverview, and made arrangements with them to funnel nearly 50% of the sales proceeds to his companies Beaver Creek and Caddo.

43.     North Bay and Riverview generally sold BIH shares into the public market within weeks of receiving them. North Bay, Bimini Reef and Riverview also regularly sent a portion of the sales proceeds to Burmaster, Hayter or entities under their control. Furthermore, the BIH shares North Bay, Bimini Reef and Riverview received did not come from a *bona fide* offering, because, among other reasons, they paid little or no consideration for the shares.

44.     No registration statement has been filed or is in effect with the Commission in connection with the securities BIH offered to North Bay, Bimini Reef, and Riverview. In addition, the Defendants were not entitled to any exemption from registration for numerous reasons, including the following: (1) they were affiliated with the issuer or acted as a proxy for other Defendants; (2) North Bay and Riverview held the shares for only a short time before selling them on the public market; (3) they acted as statutory underwriters; (4) there was little or no consideration paid; (5) the sales proceeds were funneled back to other Defendants; and (6) there was no investment intent.

45.     Riverview sold more than 46 million BIH shares for more than $500,000.  In turn, Riverview wired more than $230,000 in sales proceeds to Beaver Creek.

46.     Bimini Reef sold more than 26 million BIH shares for more than $500,000.  In turn, Bimini Reef wired more than $240,000 in sales proceeds to Caddo.

47.     North Bay sold more than 21 million BIH shares for more than $110,000.  In turn, North Bay wired more than $90,000 in sales proceeds to Baron.

## V.     CLAIMS FOR RELIEF

### COUNT I

### Sales of Unregistered Securities in Violation of Sections 5(a) and 5(c) of the Securities Act

#### (Against All Defendants)

48.     The Commission repeats and realleges paragraphs 1 through 47 of its Complaint.

49.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities and transactions described in this Complaint, and no exemption from registration exists with respect to these securities and transactions.

50.     Starting no later than April 2008, the Defendants, directly and indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise; (b) carried securities or causing such securities to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or (c) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through

14

the use or medium of any prospectus or otherwise, without a registration statement having been filed or being in effect with the Commission as to such securities.

51.     By reason of the foregoing, the Defendants violated, and, unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT II

### Fraud in Violation of Section 17(a)(1) of the Securities Act

### (Against Defendants BIH, Burmaster and Hayter)

52.     The Commission repeats and realleges paragraphs 1 through 47 of its Complaint.

53.     Starting no later than April 2008, BIH, Burmaster and Hayter directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, knowingly, willfully or recklessly employing devices, schemes or artifices to defraud.

54.     By reason of the foregoing, BIH, Burmaster and Hayter, directly and indirectly, have violated and, unless enjoined, are reasonably likely to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a).

## COUNT III

### Fraud in Violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act

### (Against Defendants BIH, Burmaster and Hayter)

55.     The Commission repeats and realleges paragraphs 1 through 47 of its Complaint.

56.     Starting no later than April 2008, BIH, Burmaster and Hayter, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (b) engaged in transactions, practices and courses of business which are now operating or will operate as a fraud or deceit upon purchasers and prospective purchasers of such securities.

57.     By reason of the foregoing, BIH, Burmaster and Hayter, directly and indirectly, have violated and, unless enjoined, are reasonably likely to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and 77q(a)(3).

## COUNT IV

### Fraud in Violation of Section 10(b) and Rule 10b-5 of the Exchange Act

### (Against Defendants BIH, Burmaster and Hayter)

58.     The Commission repeats and realleges paragraphs 1 through 47 of its Complaint.

59.     Starting no later than April 2008, BIH, Burmaster and Hayter, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in

16

acts, practices and courses of business which have operated, are now operating or will operate as a fraud upon the purchasers of such securities.

60.     By reason of the foregoing, BIH, Burmaster and Hayter have directly or indirectly violated and, unless enjoined, are reasonable likely to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

### COUNT V

### Aiding and Abetting BIH's Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

### (Against Defendants Burmaster and Hayter)

61.     The Commission repeats and realleges paragraphs 1 through 47 of its Complaint.

62.     Starting no later than April 2008, BIH, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and courses of business which have operated, are now operating or will operate as a fraud upon the purchasers of such securities.

63.     Starting no later than April 2008, Burmaster and Hayter knowingly, willfully, or recklessly aided and abetted BIH's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Burmaster and Hayter also, directly and indirectly, had a general awareness that they were part of an overall activity that was improper or illegal and knowingly, or were extremely reckless in not knowing, and provided substantial assistance to

17

BIH's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

64.     By reason of the foregoing acts, Burmaster and Hayter aided and abetted and, unless enjoined, are reasonably likely to aid and abet BIH's violations of Section 10(b) and Rule 10b-5 of the Exchange Act.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine and find the Defendants have committed the violations of the federal securities laws alleged herein.

### II.

### Permanent Injunction

Issue a Permanent Injunction restraining and enjoining the Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act, and restraining and enjoining Defendants BIH, Burmaster, Hayter, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as indicated above.

18

## III.

### Disgorgement

Issue an Order directing the Defendants and Relief Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## IV.

### Penalties

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d); and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## V.

### Penny Stock Bars

Issue an Order pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6), barring Defendants Burmaster, Hayter, Astrom and Guthrie from participating in any future offering of a penny stock.

## VI.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VII.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may

enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

September 17, 2010

Respectfully submitted,

By: _____

Christopher Martin
Senior Trial Counsel
Arizona Bar No. 018486
Direct Dial:  (305) 982-6386
E-mail: martinc@sec.gov

Julie M. Russo
Senior Counsel
Fla. Bar No. 388947
Direct Dial: (305) 416-6244
E-mail:  russoj@sec.gov

Attorneys for Plaintiff
**U.S. Securities and Exchange Commission**
801 Brickell Avenue, Suite 1800
Miami, Florida  33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154