**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

**CASE NO. 2:10-CV-577-FTM-29 DNF**

SECURITIES AND EXCHANGE COMMISSION,　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　Plaintiff,　　　　)
v.　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
BIH CORPORATION,　　　　　　　　　　　　　)
WAYNE A. BURMASTER, JR.,　　　　　　　　　)
EDWARD W. HAYTER,　　　　　　　　　　　　)
NORTH BAY SOUTH CORPORATION,　　　　　　)
BIMINI REEF REAL ESTATE, INC.,　　　　　　　)
RIVERVIEW CAPITAL INC.,　　　　　　　　　　)
CHRISTOPHER L. ASTROM, and　　　　　　　　)
DAMIAN B. GUTHRIE,　　　　　　　　　　　　)
　　　　　　　　　　　　　　Defendants,　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
BARON INTERNATIONAL, INC.,　　　　　　　　)
THE CADDO CORPORATION, and　　　　　　　　)
BEAVER CREEK FINANCIAL CORPORATION,　　)
　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　Relief Defendants.　　)
_____)

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**MOTION FOR DEFAULT JUDGMENT OF PERMANENT INJUNCTION AND OTHER**
<u>**RELIEF AGAINST WAYNE A. BURMASTER, JR.**</u>

# I.  INTRODUCTION

Plaintiff Securities and Exchange Commission, pursuant to Federal Rule of Civil Procedure 55(b)(2), moves for entry of default judgment against Defendant Wayne A. Burmaster, Jr.  In particular, the Commission seeks an order:  (1) entering judgment against Burmaster on Counts I through V of the Commission's Complaint; (2) entering a permanent injunction enjoining Burmaster from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934; (3) holding Burmaster jointly and severally liable with other Defendants for $1,137,106 of disgorgement and $212,052 of prejudgment interest; (4) entering a penny stock bar against Burmaster pursuant to Section 20(g) of the Securities Act and Section 21(d)(6) of the Exchange Act; and (5) reserving jurisdiction for up to 120 days to allow the Commission to propose a specific civil money penalty amount that Burmaster should pay.

# II.  FACTUAL AND PROCEDURAL BACKGROUND

The Commission filed its Complaint in this action on September 20, 2010 to, among other things, restrain and enjoin Burmaster, and others from further violating the federal securities laws in connection with a pump and dump scheme, which involved the offer and sale of unregistered securities of BIH Corporation's stock.  The Complaint also seeks to, among other things, require Burmaster to pay disgorgement with prejudgment interest thereon, pay a civil money penalty, and bar Burmaster from participating in any penny stock offering.  [*See* DE 1].

On October 25, 2010, the Commission filed the acknowledgement and acceptance of service of the Complaint by counsel for Burmaster and others.  [DE 26].[1]  By Court Orders (DE

---

[1] On May 8, 2012, Burmaster filed his amended answer and affirmative defenses and a crossclaim.  [DE 93].   On May 29, 2012 the Commission filed a motion to strike Burmaster's amended answer and affirmative defenses, which Burmaster responded to on August 8, 2012.  [DE 100 & 108].  Subsequently, the Court granted the motion to strike in part and denied it in part, by among other things, striking numerous affirmative defenses, treating other affirmative defenses as denials, and striking Burmaster's counter claims and third party complaint.  [DE 145].

170 & DE 175), the parties were to meet and confer to prepare the Final Joint Pretrial Statement. Burmaster, however, failed to attend the meeting or participate. [DE 178]. The Court gave him an opportunity to show cause why sanctions should not be imposed for his failure to cooperate. The Court warned Burmaster that his failure to show cause would result in striking his amended answer and remaining affirmative defenses. [DE 180].

Burmaster did not respond to the Court's Order to Show Cause. On March 3, 2014, the Commission notified the Court of Burmaster's failure to show cause. [DE 182]. Thereafter, the Court struck Burmaster's amended answer and remaining affirmative defenses. [DE 185]. On March 11, 2014, the Commission moved for entry of clerk's default against Burmaster. [DE 186].[2] On April 4, 2014, the Magistrate granted the Commission's Motion for Entry of a Clerk's Default, and several days later, the clerk entered default against Burmaster. [DE 199-200].[3]

## III.    THE COMMISSION IS ENTITLED TO DEFAULT JUDGMENT

Upon the Clerk's entry of a default against Burmaster, the allegations of the Complaint were deemed admitted and the Commission's entitlement to relief was established against him. *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987). Thus, the following allegations of the Complaint are deemed admitted against Burmaster:

### 1.    Introduction

From 2008 through at least March 2009, Burmaster and other Defendants implemented a pump-and-dump scheme involving the sale of unregistered shares of BIH Corporation's stock to the investing public. Burmaster and other Defendants pumped up the price of BIH's stock by

---

[2] The Commission filed its Motion for Summary Judgment against Burmaster and others on March 2, 2012. [DE 67] Ultimately, on March 13, 2014, the Court denied without prejudice the Commission's Motion for Summary Judgment as to Burmaster to allow the Commission "to move for default and default judgment" against him. [DE 189 at pp. 14-15].

[3] Moreover, Burmaster is not currently in the U.S. military. [*See* attached Exhibit 1, Affidavit of Christopher E. Martin]. A second affidavit is attached as Exhibit 2 indicating Burmaster is not an infant, a minor, or incompetent.

disseminating false and misleading press releases and placing false information on BIH's website regarding the identity of the individuals directing BIH's affairs, BIH's operations and business relationships, and BIH's stock and dividend payments. [DE 1 ¶ 1]. Burmaster and other Defendants masked their control over BIH, by creating an alter ego, Cris Galo, who was purportedly BIH's president and CEO. Not only did they create a fictitious person, they also made up an impressive bio – that he was allegedly an accomplished entrepreneur with interests in numerous businesses with investments in Florida and other states. [*Id.*]. In reality, Galo did not work for BIH, and there was no accomplished entrepreneur running BIH. Instead, there was only Burmaster and Hayter, who had failed in their previous business ventures. [*Id.*]. As part of the scheme, Burmaster and other Defendants also illegally distributed BIH's stock to other Defendants. In turn, they dumped more than $1 million of BIH's stock on unwitting investors and divided these illegally obtained sales proceeds. [*Id.* ¶ 2].

### 2. <u>Defendants & Related Individual</u>

Defendant BIH was a Nevada corporation that was headquartered in Fort Myers, Florida. BIH was a penny stock and claimed to be a holding company specializing in the restaurant and hospitality industry. BIH was previously known as Prime Restaurants, Inc. In February 2009, the Commission entered an order temporarily suspending trading in BIH's stock. [*Id.* ¶ 4].

Defendant Burmaster, resides in New York. He along with Hayter controlled BIH. Prior to being involved with BIH, Burmaster was affiliated with two failed business ventures in the restaurant and hospitality industry, Prime Restaurants and IBAC Corp. When the Commission took his testimony during its investigation, he asserted the 5th Fifth to numerous questions. Burmaster also served as a director of Defendant North Bay South Corp. [*Id.* ¶ 5].

Defendant Hayter, resides in New York. He along with Burmaster controlled BIH. Prior to being involved with BIH, he was affiliated with Prime Restaurants and IBAC. [*Id.* ¶ 6].

A related individual, Christian Gallo, 39, is a resident of New York. He is Burmaster's brother-in-law. When Gallo provided investigative testimony, he asserted the 5th Amendment to numerous questions. When he did substantively testify, Gallo testified, among other things, that his work experience primarily consisted of working off-the-book jobs, such as collecting cans out of the recycling garbage bail in his neighborhood, and working as a public adjustor. Gallo did not testify that he had ever worked for BIH or Prime Restaurants. [*Id.* ¶ 15].

### 3. **The Defendants' Fraudulent Scheme**

#### a. **BIH's Fictitious President and CEO – Galo**

BIH claimed on its website that Galo was purportedly a 42 year old "accomplished entrepreneur" with interests in numerous businesses, who allegedly served as BIH's president and CEO. The website claimed that he had a benevolent business philosophy, and under "no circumstances will" he enter into any agreement that will not benefit BIH's shareholders. Galo also reportedly maintained business investments in various states, including Florida. In reality, Galo was an alter ego Burmaster and Hayter used to mask their domination and control over BIH, and to carry out a classic penny stock pump-and-dump. [*Id.* ¶ 19].

Burmaster and Hayter controlled and dominated virtually every facet of BIH. BIH's corporate address was in Fort Myers, Florida. This address was a UPS mailbox Burmaster rented, who had incoming mail forwarded to a commercial mailbox that Hayter rented. Further evidencing their control over BIH, phone calls to the company's corporate phone number were routed to Burmaster via a commercial answering service. [*Id.* ¶ 20]. Furthermore, while Galo was listed as the contact person for BIH's registered agent service, Galo's contact information was actually Burmaster's personal email address and a fax number both Burmaster and Hayter used. Also, Galo supposedly signed off on correspondence with BIH's transfer agent and NASDAQ, yet the phone numbers and email addresses of Burmaster and Hayter were used in

such communications.  Finally, while Galo was the contact person listed for BIH's Marketwire account, through which BIH disseminated its fraudulent press releases, the addresses, email addresses, and phone numbers given for Galo were linked to Burmaster and Hayter.  [*Id.* ¶ 21].

Moreover, the two had previously used Galo to mask who actually controlled BIH's predecessor, Prime Restaurants when investors were concerned Hayter was running another stock scam.  For example, Prime Restaurants' August 2, 2007 press release addressing shareholders' questions and concerns, claimed the fictitious Galo was the president, CEO and majority shareholder of Prime Restaurants, and that Hayter "neither owns or controls any stock in the company and has no positions in the management of the company." [*Id.* ¶ 22].

### b.    Fraudulent Press Releases

BIH, Burmaster and Hayter made numerous material misrepresentations and omissions in addition to the false statements on BIH's website concerning Galo.  On March 18, 2008, they issued a press release that Prime Restaurants was changing its name to BIH and purportedly quoted Galo.  The quote of Galo was fabricated as he did not exist. [*Id.* ¶¶ 23-24].  Additionally, on April 22, 2008, they issued a press release claiming it had acquired Baron, and falsely claimed BIH had "agreed to expend several million dollars to complete its acquisition of Baron" and attributed a quote to Galo.  In reality, BIH did not expend anywhere near several million dollars to acquire Baron and they fabricated the quote for Galo.  [*Id.* ¶ 25].

In an April 29, 2008 press release, they announced that Baron was awarded a contract for the "complete installation of beverage systems" at Citi Field in New York City, and that "revenues from this job are very substantial."  In June 2008, they once again touted Citi Field as a client.  BIH's statements were false and misleading as Baron had only been hired as a subcontractor to install the beer dispensing equipment at Citi Field and the contract was cancelled prior to the June 19 press release.  [*Id.* ¶ 26].

On April 30, 2008, they announced the number of shares BIH had: authorized, outstanding, and restricted, as well as its public float and quoted Galo. [*Id.* ¶ 27]. On June 2, 2008, they announced BIH was going to implement a significant buyback/reduction of BIH's shares and quoted Galo. [*Id.* ¶ 28]. On June 19, 2008, they announced BIH was continuing the buyback program of BIH's shares and quoted Galo. [*Id.* at ¶ 30]. These quotes were fabricated, since Galo did not exist and these press releases were misleading as they were flooding the market with unregistered BIH shares. [*Id.* ¶¶ 27-28 & 30].[4]

On June 20, 2008, they announced BIH had purportedly received an unsolicited offer to pay up to 20 cents a share for its stock and its board of directors would meet to consider the offer. In addition, Galo was quoted as stating that BIH was "materially undervalued" and that he would "converse with the Board of Directors." On June 23, 2008, they announced that BIH's board of directors, including Galo, had purportedly held a strategic meeting regarding this offer for BIH's stock. These press releases were false and misleading. Galo did not exist; therefore, these meetings could not have taken place and Galo was not making any decision for the company, and the quotes were fabricated. [*Id.* ¶ 31].

On June 25-26, 2008, they issued press releases that announced that BIH was going to sell Baron for between 19 to 23 cents a share and that if the sale was completed BIH would pay a one time cash dividend of between 7 to 9 cents a share. In addition, BIH claimed that Galo was busy working on the transaction. These press releases were false and misleading, because Galo did not exist so he could not have been working on this purported transaction. [*Id.* ¶ 32]. On August 19, 2008, they issued another press release regarding the purported pending sale of Baron. The press release claimed that additional revenues Baron generated would create "a

---

[4]  On June 3, 2008, they issued another false press release that BIH was negotiating to acquire a restaurant equipment manufacturing firm that would purportedly allow BIH to "increase revenues and profits" and supposedly quoted the fictitious Galo. [*Id.* ¶ 29].

higher then previously announced sales price."  These statements were false and misleading because the additional revenues did not exist.  [*Id.* ¶ 33].  On November 11, 2008, they issued a press release responding to shareholders' inquiries and claimed the potential purchase price of Baron had been increased due to "several lucrative new major accounts and increased revenue."  These statements were false and misleading because the lucrative new major accounts or additional revenues to generate a higher sales price did not exist.  [*Id.* ¶ 34].

On November 13, 2008, they issued a press release that falsely reported Baron had "signed a multi-million dollar renovation deal to supply and provide labor and materials for 20 Applebee's outlets" and quoted the fictitious Galo.  This press release was also false and misleading, since Baron was servicing only one Applebee's franchisee, which resulted in Baron generating only approximately $4,000 in revenue.  [*Id.* ¶ 35].

Between December 2008 and January 2009, they issued several press releases that falsely announced plans to pay a cash and stock dividend.  They issued one press release stating "BIH will still pay its shareholders a dividend" and supposedly quoted the fictitious Galo and how he would purportedly use all his powers as majority shareholder to make sure the dividend payment included a stock and cash dividend.  These statements were false and misleading as Galo could not use his purported powers to do anything as he did not exist, the quotes were fabricated, and there were not enough funds to pay the dividend.  [*Id.* ¶ 36].

On December 18, 2008, they issued a press release stating it would pay a cash dividend from "earnings."  In addition, on January 7, 2009, they issued another press release purportedly giving dates when BIH would make the dividend payment.  Also, on January 12, they issued another press release claiming it provided the FINRA/NASDAQ dividend department with the requisite notice to issue a cash dividend.  These statements were false and misleading because

Galo did not exist, BIH did not have the approximately $950,000 to pay the dividend, much less $950,000 in "earnings." Furthermore, BIH did not provide the requisite notice to the FINRA/NASDAQ dividend department. Notably, BIH failed to pay a cash dividend. [*Id.* ¶ 37].

The fraudulent promotional activities of Burmaster and Hayter caused BIH's stock price and trading volume to increase markedly. From April 22 through November 13, 2008, BIH's stock price fluctuated from a low of $0.001 to a high of $0.05 (a 4,900% increase), on average daily trading volume of 4.8 million shares. Prior to this, BIH's average daily trading volume was approximately 1.36 million shares at an average per share price of $0.0017. [*Id.* ¶ 38].

### 4. <u>The Unregistered Offerings</u>

From 2008 through March 2009, Burmaster and Hayter made unregistered offerings of BIH shares to North Bay and others. BIH received little or no consideration for issuing tens of millions of shares to North Bay and other companies. In turn, these entities dumped more than $1 million of BIH's stock on investors at inflated prices. Certain Defendants and their principles retained a portion of the more than $1 million of sales proceeds and sent the remaining funds to entities under the control of BIH, Burmaster and Hayter. [*Id.* ¶ 39].

Prior to BIH's promotional activities starting in April 2008, forgeries were executed on behalf of the fictional Galo and given to BIH's transfer agent as he purportedly issued nearly 40% of BIH's publicly available shares to Bimini Reef and Riverview for little or no consideration. [*Id.* ¶ 40]. Furthermore, from 2008 through 2009, Burmaster and Hayter issued an additional 36.4 million BIH shares to North Bay and another Defendant, for little or no consideration. [*Id.* ¶ 41]. North Bay and the other Defendant generally sold BIH shares into the public market within weeks of receiving them. In turn, they regularly sent a portion of the sales proceeds to Burmaster, Hayter or entities under their control. Furthermore, the BIH shares North Bay and Riverview Defendants received did not come from a *bona fide* offering, because they

paid little consideration for the shares. [*Id.* ¶ 43]. North Bay also sold more than 21 million

BIH shares for more than $110,000. [*Id.* ¶¶ 45-47].

No registration statement has been filed or is in effect with the Commission in connection

with BIH's unregistered offerings. In addition, Burmaster was not entitled to any exemption

from registration, because: (1) he was affiliated with the issuer; (2) North Bay held the shares for

only a short time before selling them; (3) he acted as statutory underwriters; (4) there was little

consideration paid; (5) the sales proceeds were funneled back to other Defendants; and (6) there

was no investment intent. [*Id.* ¶ 44].

## IV.  MEMORANDUM OF LAW

The factual allegations of a Complaint are deemed admitted by the entry of a default.

*Buchanan*, 820 F.2d at 360; *Nishimatsu Construction Co. v. Houston Nat'l Bank*, 515 F.2d 1200,

1206 (5th Cir. 1975). When a defendant fails to defend an action and a default has been entered,

his liability for violations of the federal securities laws as alleged in the Complaint and the

propriety of the relief sought, is deemed established. *Buchanan*, 820 F.2d at 360; *Dundee Cement

Co. v. Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983). Moreover,

the Complaint's factual allegations overwhelmingly support entry of a Default Judgment.

### A.  BURMASTER VIOLATED SECTION 5 OF THE SECURITIES ACT

Count I of the Commission's Complaint alleges Burmaster and other Defendants violated

Sections 5(a) and (c) of the Securities Act, which prohibit the offer or sale of securities that are

not registered with the Commission unless an exemption is available. *SEC v. Continental

Tobacco Co.*, 463 F.2d 137, 155 (5th Cir. 1972).[5] Section 5 "imposes strict liability on offerors

and sellers of unregistered securities . . . regardless of . . . any degree of fault, negligent or

---

[5]  The purpose of the registration requirement is to "protect investors by promoting full disclosure of information
thought necessary to informed investment decisions." *SEC v. Lybrand*, 200 F. Supp. 2d 384, 392 (S.D.N.Y. 2002).

intentional, on the seller's part." *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004) (citations omitted).[6] Liability for violations of Section 5 extends to both direct and indirect participants. A defendant violates Section 5 if he is a "necessary participant" in the transaction or engages in steps necessary to complete the distribution of shares to the public – a standard that "essentially ask[s] whether, but for the defendant's participation, the sale transaction would not have taken place." *SEC v. Murphy*, 6262 F.2d 633, 651-52 (9th Cir. 1980). "This liability extends beyond those who sell stock to all necessary participants in a sale of unregistered stock." *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 372 (S.D.N.Y. 1998), *aff'd* 155 F.3d 129 (2d Cir. 1998).

To establish a *prima facie* case of a Section 5 violation, the Commission must show the defendant, directly or indirectly: (1) sold or offered to sell securities; (2) through the use of interstate transportation or communication;[7] and (3) when no registration statement was in effect as to the transaction. *Calvo*, 378 F.3d at 1214-15 (citations omitted); *Lybrand*, 200 F. Supp. 2d at 392. Once the Commission establishes these elements, the burden of proof shifts to the defendant to prove the securities offered or sold qualified for a registration exemption. *SEC v. Ralston Purina Co.,* 346 U.S. 119, 126 (1953). Liability for violations of Section 5 extends to both direct and indirect participants, such as those who have "engaged in steps necessary to the distribution of [unregistered] security issues." *SEC v. Chinese Consol. Benev. Ass'n, Inc.*, 120 F.2d 738, 741 (2d Cir. 1941). An indirect participant, who has not himself passed title to an

---

[6] The Commission need not prove scienter under Section 5. *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 901-02 (5th Cir. 1980). Thus, a defendant's good faith belief that the sales or offers in question were legal is not a defense to a Section 5 claim. *SEC v. Rosen*, 2002 WL 34421029, at *3 (S.D. Fla. Feb. 22, 2002). "Such a strict liability scheme fits with the overarching goal of Congress in enacting the '33 Act – protecting the innocent investing public." *Id.*

[7] The Defendants used the facilities of interstate commerce. This requirement of a Section 5 violation is broadly construed to include tangential mailings or intrastate telephone calls. *See SEC v. Softpoint, Inc.*, 958 F. Supp 846, 859-62 (S.D.N.Y. 1997) (citing *U.S. v. Wolfson*, 405 F.2d 779, 783-84 (2d Cir. 1968) (construing Section 5(a)(1) to prohibit use of the mails to send stock offers, to transmit sales literature, to ship securities certificates after sale, to remit the proceeds to the seller, to send buyers' confirmation slips, and to effect more tangential communications)).

unregistered security, may nevertheless be liable.  *See Murphy*, 626 F.2d at 651-52.

The Commission has alleged the *prima facie* elements of a Section 5 claim.  Specifically, the Complaint alleges that: (1) no registration statement has been filed or was in effect with the Commission for BIH's securities (DE 1, at ¶¶ 44 & 49); (2) Burmaster and other Defendants offered and sold BIH's shares to investors (*id*. at ¶¶ 2-3, 7, & 39-49); and (3) in connection with the conduct alleged in this Complaint, Burmaster and other Defendants made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails (*id*. at ¶ 18) by placing false information on BIH's website, disseminating false press releases, and wiring sales proceeds to Burmaster, Hayter, Baron, or entities under their control.  (*id*. at ¶¶ 19, 23-38, & 43-47).[8]  Accordingly, the Complaint alleges a claim against Burmaster under Section 5 of the Securities Act and the Court should enter Default Judgment against Burmaster on Count I of the Complaint.

## B. BURMASTER VIOLATED 17(A) OF THE SECURITIES ACT AND SECTION 10(b) AND RULE 10b-5 OF THE EXCHANGE ACT

### 1. Elements of the Commission's Anti-Fraud Claims

Counts II through IV of the Complaint alleges Burmaster violated Section 17(a) of the Securities Act (15 U.S.C. § 77q(a)) and Section 10b and Rule 10b-5 of the Exchange Act (15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5), which proscribes fraudulent conduct in the offer, purchase or sale of securities.  These provisions prohibit essentially the same type of conduct. *United States v. Naftalin*, 441 U.S. 768, 773 n. 4 (1979); *SEC v. Unique Financial Concepts*, 119 F. Supp. 2d 1332, 1339 (S.D. Fla. 1998), *aff'd*, 196 F.3d 1195 (11th Cir. 1999).  One of the ways the Commission can establish a violation of these provisions is to show: (1) a misrepresentation or omission; (2) that is material; (3) made with scienter; (4) in the offer or sale or in connection

---

[8]  *Softpoint*, 958 F. Supp. at 865 ("[t]he jurisdictional requirements of Section 17(a) and 10(b) and Rule 10b-5 are broadly construed, so as to be satisfied by any activity connected with a national securities exchange, by intrastate telephone calls, and by even the most ancillary mailings.") (citations omitted).

with the purchase or sale of securities. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *SEC v. Chemical Trust*, 2000 WL 33231600, *9 (S.D. Fla. Dec. 19, 2000). The Commission must also show the use of interstate commerce, the mails, or a national securities exchange. *SEC v. Corporate Relations Group*, 2003 WL 25570113 * 7 (M.D. Fla. March 28, 2003).

Essentially the same elements are required under Section 17(a)(1)-(3) in connection with the offer or sale of a security, although no showing of scienter is required under subsections (a)(2) or (a)(3). *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996) (citing *Aaron v. SEC,* 446 U.S. 680, 701-02 (1980)); *Corporate Relations Group*, 2003 WL 25570113 at *7. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Aaron* 446 U.S. at 686 n.5, 695-97; *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). As pled in the Complaint, Burmaster violated Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act.[9]

### a.    Burmaster Made Misrepresentations and Omissions

A defendant makes a false statement when he "acting alone or with others, creates a misrepresentation." *In re Enron Corp. Sec. Litig.*, 235 F. Supp. 2d 549, 588 (S.D. Tex. 2002); *SEC v. K.W. Brown and Co.*, 555 F. Supp. 2d 1275, 1304 (S.D. Fla. 2007). This can encompass participating in a course of business that operates as a fraud on the buyers or sellers of stock. *SEC v. Zandford*, 535 U.S. 813, 819-22 (2002).

Burmaster made numerous misrepresentations and omissions: (1) on BIH's website and in press releases regarding Galo by claiming he was running the company, omitting that him and Hayter were actually running the company, claiming BIH's shares were being repurchased,

---

[9] The Commission does not need to prove investor reliance, loss causation or damages" in actions under 10(b) or 17(a). *SEC v. Credit Bancorp*, 195 F. Supp. 2d 475, 490-91 (S.D.N.Y. 2002); *SEC v. Merchant Capital*, No. 06-10353, 2007 WL 983082 (11th Cir. 2007).

potential business transactions, and Baron being a wholly-owned subsidiary (DE 1 ¶¶ 19-38); (2) creating a fictitious person, Galo, and forging his name on documents given to the transfer agent and the Commission (*id.*, ¶¶ 19-22); (3) hiding his and Hayter's involvement in BIH (*id.*); and (4) issuing shares in a scheme to evade Section 5 (*id.*, ¶¶ 39-47).

### b.    Burmaster's Misrepresentations and Omissions Were Material

The objective standard for materiality, which governs this case, is whether a reasonable investor or prospective investor would have considered the information important in deciding whether to invest and if there is a substantial likelihood the misrepresented or omitted facts would have assumed actual significance in the deliberations of a reasonable investor. *SEC v. Steadman*, 967 F.2d 636 at 643 (D.C. Cir. 1992); *Basic*, 485 U.S. 224 at 231-32, 240 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976); *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1323 (11th Cir. 1982). If there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" then it is material. *Basic*, 485 U.S. at 231-32; *Carriba Air.*, 681 F.2d at 1323 (a statement is material if "a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action").

It is hard to imagine an investor or prospective investor not considering it important in deciding whether or not to invest to know that the company CEO and president was a fictitious person with a made up background of an "accomplished entrepreneur" and business holdings in numerous states, and that this fake person was made up to hide the identities of the unsuccessful principals. Any reasonable investor would have considered it important to know they were being lied about BIH's operations, business relationships, and dividend payments, and that the market was being flooded with tens of millions of unregistered shares. Accordingly, this Court should find that Burmaster's fraudulent statements and omissions were material.

### c.    Burmaster Acted With a High Degree of Scienter

Scienter is required to establish violations of Section 17(a)(1) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act.[10]   Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193 n.12.   Courts have further defined scienter as either knowing misconduct or severe recklessness – extreme departure from the standards of ordinary care.   *Id.*, at 193.   The Eleventh Circuit has defined severe recklessness as involving "highly unreasonable omissions or misrepresentations . . . which is either known to the defendant or is so obvious that the defendant must have been aware of it." *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989) (citation omitted).[11]

Evidence of the scienter of Burmaster is plentiful as the undisputed facts establish he acted with a high degree of scienter.   Burmaster knew, or was severely reckless in not knowing, that: (1) Galo was not running the company; (2) BIH made a series of misrepresentations in its press releases; and (3) to capitalize on the pumping of BIH's stock, Burmaster illegally distributed tens of millions of its shares.   Hence, he acted with a high degree of scienter**.**

### d.    Burmaster's Misconduct Meets The "In Connection With" Test

An action satisfies the "in connection with" requirement if the fraud somehow touches upon the securities transactions.   *SEC v. Rana Research*, 8 F.3d 1358 at 1362 (9th Cir. 1993); s*ee also Zandford*, 535 U.S. at 819 (in connection language is broadly interpreted); *Jacoboni v. KPMG LLP*, 314 F. Supp. 2d 1172, 1179 (11th Cir. 2004) (in connection requirement is extremely broad).   Here, Burmaster's fraudulent scheme was in connection with representations

---

[10]   A showing of scienter, however, is not required to establish a violation of Sections 17(a)(2) or 17(a)(3) of the Securities Act.  *Aaron*, 446 U.S. at 696-97; *Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 916 (11th Cir. 1987). Because Burmaster  acted with scienter in violating Sections 10(b) and 17(a)(1), we have also demonstrated he violated Sections 17(a)(2) and (3).

[11] A company's scienter may be imputed from that of the individuals controlling it.  *See SEC v. Blinder, Robinson & Co.*, 542 F. Supp. 468, 476 n.3 (D. Colo. 1982) (citing *SEC v. Manor Nursing*, 458 F.2d 1082, 1096-97 n.16-18 (2nd Cir. 1972).

to the public markets through the issuance of false press releases, forgeries and other false information given to BIH's transfer agent to have shares issued, and to FINRA/NASDAQ.[12]

The Commission has established each of the elements to show violations of Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act by Burmaster, and the Court should, therefore, enter default judgment against him on Counts II-IV.

### C.    BURMASTER AIDED AND ABETTED BIH's VIOLATIONS OF SECTION 10(b) AND RULE 10B-5 OF THE EXCHANGE ACT

To establish aiding and abetting liability under the federal securities laws, the Commission must show: (1) a primary or independent securities law violation committed by another party; (2) awareness or knowledge by the aider and abettor that his or her role was part of an overall activity that was improper; and (3) that the aider and abettor knowingly and substantially assisted the conduct that constitutes the violation. *See Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000); *Woodward v. Metro Bank*, 522 F.2d 84, 94-95 (5th Cir. 1975).

The facts alleged in the Complaint show that starting no later than April 2008, Burmaster and another defendant knowingly, willfully, or recklessly aided and abetted BIH's violations of Section 10(b) and Rule 10b-5 of the Exchange Act.  Based on the above, (1) BIH clearly committed a primary violation of Section 10(b) and Rule 10b-5 of the Exchange Act; (2) Burmaster clearly had a general awareness that he was part of an overall activity that was improper or illegal; and (3) knowingly, or was extremely reckless in not knowing, and provided substantial assistance to BIH's primary violations.

Accordingly, the Commission has established Burmaster aided and abetted and, unless enjoined, is reasonably likely to aid and abet BIH's violations of Section 10(b) and Rule 10b-5 of the Exchange Act, and the Court should enter default judgment against him on Count V.

---

[12]   We have already established the element of  interstate commerce above, in our discussion of Burmaster's use of the mails and interstate commerce in connection with his violations of Section 5 of the Securities Act.

## D.  PERMANENT INJUNCTIVE RELIEF IS WARRANTED

Burmaster's violations of the securities laws as demonstrated above, establish the basis for a permanent injunction barring him from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act and from aiding and abetting BIH's violations of Section 10(b) and Rule 10b-5 of the Exchange Act.   The Commission appears in this matter "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws."   *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).   We, therefore, do not have to show irreparable injury or a balance of the equities in our favor.  *See, e.g., SEC v. Unifund SAL*, 910 F.2d 1028, 1036 (2d Cir. 1990).  The Commission is entitled to a permanent injunction when it establishes (1) the defendant has violated the securities laws, and (2) a reasonable likelihood the defendant will repeat the violations. *Calvo*, 378 F.3d at 1216; *SEC v. Unique Financial Concepts*, 196 F.3d 1195 at 1199 n.2 (11th Cir. 1999).   In determining whether a defendant is likely to continue to violate the securities laws, courts consider the following factors: (1) the egregiousness of the actions; (2) the isolated or recurrent nature of the violations; (3) the degree of scienter involved; (4) the Defendants' recognition of the wrongful nature of their conduct; (5) the sincerity of their assurances against future violations; and (6) the likelihood the Defendants occupation will present opportunities for future violations. *Calvo,* 378 F.3d at 1216.[13]

All these factors justify the Court entering a permanent injunction here.   As further discussed above, Burmaster's conduct was egregious and done with a high degree of scienter.   In addition, Burmaster's violations were recurrent as this was not an isolated occurrence.   There

---

[13]   As the *Management Dynamics* Court observed, "[c]ertainly, the commission of past illegal conduct is <u>highly suggestive</u> of the likelihood of future violations . . . [and] "appellate courts have repeatedly cautioned that cessation of illegal activity does not ipso facto justify the denial of an injunction") 515 F.2d at 807 (emphasis added).

were numerous issuances of unregistered shares and false press releases and the misconduct lasted from at least March 2008 through April 2009. With regard to the fourth and fifth factors, Burmaster has never admitted that he has done anything wrong and has expressed no remorse. He has made no assurances, let alone sincere ones, that he will not violate the securities laws in the future. Given the existence of a number of these factors, the only way to assure Burmaster does not repeat his securities law violations is for the Court to enter a permanent injunction against him.

### 1.    <u>SEC v Goble – Requirements for Statutory Based Injunctions</u>

On May 29, 2012, the Eleventh Circuit Court of Appeals issued its opinion in *SEC v. Goble*, 682 F.3d 934 (11th Cir. 2012), which vacated a permanent injunction enjoining the defendant from any future violation of Section 10(b) and Rule 10b-5 of the Exchange Act, and from aiding and abetting other violations of the Exchange Act. *Id.* at * 940.

In vacating the injunction and remanding to the District Court for further action, the Eleventh Circuit panel wrote extensively on the issue of what it termed obey-the-law injunctions, i.e., those injunctions that track the exact language of a federal statute or rule. It noted that if an injunction only orders a party to comply with the terms of a statute, it may not comply with the requirements of Rule 65 of the Federal Rules of Civil Procedure. *Id*. at * 956. To meet the standards of Rule 65, the panel found the injunction must "specifically describe the proscribed conduct within the four corners of the injunction." *Id*. at * 952.

The Court, however, also made clear that many statutes and rules may be specific enough that an injunction not to violate their terms may fulfill the specificity requirement of Rule 65: "But, we also recognize that at times an injunction that orders a defendant to comply with a statute may be appropriate; Supreme Court precedent dictates this." *Id.* at * 950. *See also*

*McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191-95 (1949). Specifically discussing injunctions in Commission cases, the panel went on to state:

> Permitting injunctions of some breadth in the context of civil enforcement actions brought by the SEC is warranted. The Exchange Act grants the district court broad discretion to enjoin violations of the Act. *See* 15 U.S.C. § 78u(d)(1). And, where the public interest is involved, the court's equitable power has a 'broader and more flexible character.' *Commodity Futures Trading Comm'n,* 541 F.3d at 1114 (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S. Ct. 1086, 1089 (1946)). Therefore, a broad, but properly drafted injunction, which largely uses the statutory or regulatory language may satisfy the specificity requirement of Rule 65(d) so long as it clearly lets the defendant know what he is ordered to do or not do. [*Id.* at * 952].

In remanding the case to the District Court to enter a new injunction, the Court further held that an injunction may comply with Rule 65(d) when a statutory or regulatory provision specifically describes the acts required of the person enjoined. *Id.* at * 952-53.

For several reasons, the language of the proposed judgment against Burmaster, fully complies with Rule 65 and the dictates of *Goble*. First, like the statutes discussed in *Goble*, the provisions of Section 5 "specifically describe the acts required of the person enjoined."[14] The

---

[14] In particular, the proposed judgment enjoins Burmaster from: "…violating Section 5 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable exemption:

> (a) Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

> (b) Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

> (c) Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. § 77h]."

language of Section 5, which the proposed judgment tracks, specifically forbids the direct or indirect unregistered offer or sale of securities in interstate commerce, and thus encompasses direct sellers and those who are both a necessary and substantial factor in the transaction. Because the proposed judgment is narrowly tailored to enjoin the specific activity in which Burmaster engaged, and because by referring to the language of the statute, Burmaster can see exactly what conduct the injunction prohibits, the Court should enter the attached proposed judgment that tracks the language of Section 5, since it meets the requirements of Rule 65.

Second, in accordance with the holding in *Goble*, the Commission hereby recommends in this pump and dump case the following narrowly tailored language to enjoin Burmaster from further violating Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act, which meets the standards of Rule 65, because they "specifically describe[s] the proscribed conduct within the four corners of the injunction." The Commission, therefore, recommends the following appropriate particularized permanent injunction language as to Counts II through V:

## COUNTS II AND III

## SECTIONS 17(a)(1)-(3) OF THE SECURITIES ACT

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that Wayne A. Burmaster, Jr., . . . are permanently restrained and enjoined from . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;  or

(c)     to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any person about the price or trading market for any security, or (ii) making any false or misleading statement, or disseminating any false or misleading documents, materials, or information, concerning matters relating to a decision by an investor or prospective investor to buy or sell securities of any company.

## COUNTS IV AND V

## EXCHANGE ACT SECTION 10(b) AND RULE 10b-5

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that Wayne A. Burmaster, Jr., . . . are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person

by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any person about the price or trading market for any security, or (ii) making any false or misleading statement, or disseminating any false or misleading documents, materials, or information, concerning matters relating to a decision by an investor or prospective investor to buy or sell securities of any company.

The proposed judgment meets the requirements of Rule 65 since it is narrowly tailored to enjoin the specific activity in which Burmaster engaged, so he can see exactly what conduct the injunction prohibits. The Court should, therefore, enter the attached proposed judgment as to Counts II-V.

### E.     THE COURT SHOULD ORDER BURMASTER TO DISGORGE HIS ILL-GOTTEN GAINS AND PAY PREJUDGMENT INTEREST THEREON

Disgorgement is designed both to deprive a wrongdoer of his unjust enrichment and to

deter others from violating the securities laws. *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir.

1978); *see also SEC v. First City Financial Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103-1104 (2d Cir. 1972) ("The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable").  Where, as here, the fraud is pervasive, the Court should order the wrongdoer to disgorge all profits stemming from the scheme.  *CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 93-94 (2d Cir. 1986), *cert. denied*, 479 U.S. 853 (1986).  The law does not require precision in determining the proper amount of disgorgement.  The amount of disgorgement ordered "need only be a reasonable approximation of profits causally connected to the violation." *SEC v. W. Anthony Huff, et al.*, 758 F.Supp. 2d 1288, 1359 (S.D. Fla. 2010), *affd* 2012 WL 10862 (11th Cir. 2012), (citing *Brown & Co.,* 555 F. Supp. 2d at 1312; *First Jersey*, 101 F.3d at 1474-75).  The wrongdoer, who has created the uncertainty through violations of the federal securities laws, bears the risk of uncertainty.  *See First City*, 890 F.2d at 1232 (*citing SEC v. MacDonald*, 699 F.2d 47, 55 (1st Cir. 1983) (*en banc*)).[15]

Additionally, the Court should order Burmaster to pay prejudgment interest on disgorgement, since he enjoyed access to funds over a period of time as a result of his wrongdoing.  Requiring Burmaster to pay prejudgment interest is consistent with the equitable purpose of the remedy of disgorgement.  *See SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1090 (D.N.J. 1996), *aff'd* 124 F.3d 449 (3rd Cir. 1997).

Burmaster should be held jointly and severally liable for the total amount of the fraud. When two or more individuals or entities collaborate or have close relationships in engaging in the securities laws violations, they may be held jointly and severally liable for the entire amount of the fraud.  *SEC v. JT Wallenbrock & Associates, et al.*, 440 F.3d 1109, 1117 (9th Cir. 2006);

---

[15] "The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *SEC v. First Jersey Securities,* 101 F.3d 1450, 1474-75 (2d Cir. 1996).

*SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997) (holding a defendant jointly and severally liable for disgorgement); *SEC v. Berger*, 244 F. Supp.2d 180 (S.D.N.Y. 2001) (defendant jointly and severally liable because he conceived fraud and controlled corporate defendant); *Brown*, 555 F. Supp. 2d at 1312 (holding all defendants jointly and severally liable for disgorgement); *SEC v. Whittemore*, 659 F.3d 1 (D.C. 2011).  This remedy is particularly appropriate in cases like this one that involve violations of the registration provisions of Section 5 the Securities Act, because but for these violations of the registration provisions there would not have been any sale proceeds.  *SEC v. Olins*, 762 F.Supp. 2d 1193, 1197 & 1200 (N.D. Cal. 2011) (holding defendants jointly and severally liable in case involving violations of Section 5 of the Securities Act for all gross proceeds received from the unlawful sales of stock).[16]

The Complaint establishes that Burmaster received funds which came from defrauded investors.  In support of its request for disgorgement against him, the Commission refers to the Declaration of Timothy Galdencio, a Commission accountant, and supporting exhibits, which show that from March 2008 through April 2009, in total 95,116,029 BIH's shares were sold for $1,137,106.  [*See* DE 67-50, SJ. Ex. 2 at ¶ 4(D)].[17]  Hence, the Commission asks the Court to hold Burmaster jointly and severally liable in the amount of $1,137,106.  Burmaster and the other Defendants and Relief Defendants have had $1,137,106 of investors' funds since at least April 2009, the Commission, therefore, asks the Court to award prejudgment interest on this amount.  The Commission has calculated prejudgment interest on the disgorgement in accordance with the delinquent tax rate as established by the Internal Revenue Service, IRC §

---

[16]  Once the Commission presents evidence reasonably approximating the amount of a defendant's ill-gotten gains, the burden of proof shifts to the defendant.  *See First City*, 890 F.2d at 1232; *see also Hughes Capital*, 917 F. Supp. at 1085, *aff'd*, 124 F.3d 449 (3d Cir. 1997).  The defendant is then "obliged clearly to demonstrate that the disgorgement figure [is] not a reasonable approximation."  *First City*, 890 F.2d at 1232.

[17]  During this same time period, from December 2008 through April 2009, Burmaster's company, North Bay, sold 21,956,029 shares of BIH and received $115,612.  [*Id.*, at ¶ 4(C)].

6621(a)(2), and assessed on a quarterly basis, from April 2009 through the end of April 2014. [*See* attached Exhibit 3]. That rate of interest "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *First Jersey*, 101 F.3d at 1476. Application of this rate results in a prejudgment interest total of $212,052. The Court should add that amount to the disgorgement total in determining the total amount Burmaster should disgorge; therefore, the total disgorgement and prejudgment interest the Court should hold Burmaster jointly and severally liable is $1,349,158.

    **F.**    **THE COURT SHOULD ORDER BURMASTER TO PAY CIVIL MONEY PENALTIES**

The Commission seeks maximum civil money penalties against Burmaster pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act. These statutes are virtually identical and establish three tiers of penalties.[18] However, undersigned counsel does not yet have authority from the five-member Commission to recommend a specific penalty amount. Accordingly, the Commission requests the Court to reserve jurisdiction to determine a specific penalty amount upon a later motion. The Commission requests 120 days from the date the Court grants this motion to file a motion recommending a specific penalty amount.

---

[18] Under the "First Tier" the court may impose a penalty of up to (i) $5,000 on Defendant for each violation or (ii) the gross amount of pecuniary gain to Defendant as a result of the violation. Under the "Second Tier" the Court may impose a penalty of up to (i) $50,000 on Defendant for each violation or (ii) the gross amount of pecuniary gain to Defendant as a result of the violation. The Second Tier applies where the violation involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." Finally, under the "Third Tier" the Court may impose a penalty of up to (i) $100,000 on Defendant for each violation or (ii) the gross amount of pecuniary gain to Defendant as a result of the violation. The Third Tier applies where the requirements of a Second Tier penalty are present *and* the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." The statutory adjustment for inflation has increased the penalty amount by thirty percent for conduct occurring after February 14, 2005 through March 3, 2009. *See* 17 C.F.R. Pt. 201, §§ 201.1001-1002, Tbl. II to Subpt. E, 66 FR 8761 at * 8662-63. Hence, the 30% adjustment for inflation is the most appropriate rate for this case, since the fraudulent conduct began in 2008 and lasted through April 2009. Thus, under the "Third Tier" statutory enhancement, the Court may impose a penalty of up to $130,000 on Burmaster for each of his numerous violations.

### G.     THE COURT SHOULD IMPOSE A PENNY STOCK BAR

The Court should impose a permanent penny stock bar against Burmaster.  Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6), authorize district courts to bar individuals from "participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine."  15 U.S.C. §§ 77t(g)(1) & 78u(d)(6)(A).  The Court can order a penny stock bar against any person who violates the Securities Act or Exchange Act who was "engaging in activities with a[n] . . . issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, any penny stock."  15 U.S.C. §§ 77t(g)(2) & 78u(d)(6)(B).

Imposition of a permanent penny stock bar is warranted against Burmaster, because he engaged in a fraudulent scheme involving unregistered penny stock shares of BIH.  As alleged in the Complaint, BIH was an unregistered penny stock, which was a holding company that traded on the pink sheets.  [*See* DE 1 ¶¶ 4 & 39-44].  BIH's stock was a penny stock, because it was an equity security bearing a price of less than five dollars, except as provided in Rule 3a51-1.  *See* 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51-1.  At all pertinent times, BIH's stock traded at less than five dollars.  [*See Id*., ¶ 38 (BIH's stock traded between $0.001 and $.05 a share)]. Burmaster engaged in activities with an issuer for the purpose of issuing, trading or inducing the purchase or sale of a penny stock.  [*See Id*., ¶ 38 (BIH's stock traded between $0.001 and $.05 a share)]. [*See Id*., ¶ 1 (Burmaster implemented a pump-and-dump scheme); ¶ 2 (Burmaster illegally distributed BIH's stock and then dumped more than $1 million of BIH's stock on unwitting investors and divided these illegally obtained sales proceeds); ¶ 38 (Burmaster's fraudulent penny stock, which caused BIH's stock price and trading volume to increase markedly); and ¶ 47 (Burmaster's company, North Bay South, sold more than 21 million BIH shares for more than $110,000)].

Based on Burmaster's egregious misconduct, it is in the public interest for the Court to impose a permanent penny stock bar against Burmaster. *See SEC v. Sky Way Global*, 2010 WL 3276461 (M.D. Fla. 2010) (court imposed permanent penny stock bar); *SEC v. K&L Intern. Enterprises, Inc.*, 2009 WL 3157674 * 2 (M.D. Fla. 2009) (after *prima facie* showing that defendants had violated Section 5, the court imposed a temporary penny stock bar); *SEC v. Converge Global, Inc.*, 2006 WL 907567 * 5 (S.D. Fla. March 10, 2006) (in a case involving false press releases and violations of Section 10(b) and Rule 10b-5 of the Exchange Act, the Court imposed a permanent penny stock bar).   Accordingly, based on Burmaster's repeated violations of Sections 5 and 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act that involved BIH, a penny stock, the Court should impose a permanent penny stock bar against him.

## V.     **CONCLUSION**

Based on the foregoing, the Commission respectfully asks the Court to enter the requested relief.   A proposed order is submitted herewith.

Respectfully submitted,

May 2, 2014                              By: s/Christopher E. Martin
                                        Christopher E. Martin
                                        Senior Trial Counsel
                                        martinc@sec.gov
                                        Arizona Bar No. 018486
                                        Direct Dial No.:  (305) 982-6386

                                        Attorney for Plaintiff
                                        **SECURITIES AND EXCHANGE COMMISSION**
                                        801 Brickell Avenue, Suite 1800
                                        Miami, Florida  33131
                                        Telephone:  (305) 982-6300
                                         Facsimile:   (305) 536-4154

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

    Mark David Hunter, Esq.
    Leser Hunter Taubman & Taubman, PLLC
    255 University Drive
    Coral Gables, FL 33134
    Tel: (305) 629-8816
    Fax: (305) 629-8877
    *Counsel for Defendants Bimini Reef Real Estate, Inc.,*
    *Riverview Capital Inc., Christopher L. Astrom, and Damian B. Guthrie*

and that on May 2, 2014, I served the foregoing document and the notice of electronic filing by U.S. Mail to the following non-CM/ECF participants:

    Edward Hayter, *pro se*
    2167 East 21st Street, #103
    Brooklyn, NY 11229

    Wayne Burmaster, *pro se*
    88 Moffitt Street
    Staten Island, NY 10312

                                            s/Christopher Martin
                                          Christopher Martin